# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

<hr>

## ON MOTION FOR REHEARING

<hr>

## NO. 03-17-00035-CV

<hr>

**Dr. Ruthie Harper and PLLG, LLC, Appellants**

**v.**

**Wellbeing Genomics Pty Ltd., Appellee**

<hr>

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-14-002452, HONORABLE KARIN CRUMP, JUDGE PRESIDING

<hr>

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment dated April 4, 2018 and substitute the following opinion and judgment in their place, and we grant Dr. Ruthie Harper's and PLLG, LLC's motion for rehearing.

Appellants Dr. Ruthie Harper and PLLG, LLC, appeal the trial court's judgment rendered on a jury verdict finding that appellants misappropriated a trade secret of Wellbeing Genomics Pty Ltd. and that PLLG violated a non-disclosure agreement in connection with the distribution and marketing of a DNA test developed by Wellbeing to inform the personalized selection of skin-care products. Appellants challenge the evidentiary sufficiency to support the jury's findings that (1) the DNA test was a trade secret, (2) Harper and PLLG misappropriated it, and

(3) Wellbeing suffered quantifiable damages. They also challenge the trial court's award of lost-profits damages against PLLG as consequential damages precluded by the non-disclosure agreement. For the following reasons, we reverse the trial court's judgment awarding Wellbeing damages and attorney's fees on its breach-of-contract claim against PLLG and render judgment that Wellbeing take nothing against PLLG on that claim.[1] We affirm the trial court's judgment in all other respects.

## BACKGROUND

Wellbeing filed this lawsuit against appellants after it became aware that Harper was filing a patent application that allegedly disclosed some of Wellbeing's confidential information and that PLLG was negotiating a distribution agreement with a third party, Qivana, LLC, in the course of which the parties were allegedly misappropriating Wellbeing's intellectual property. Wellbeing asserted causes of action against Harper, PLLG, Qivana, and David Urman (a consultant hired by PLLG to help market and distribute Harper's skin-care products)[2] for trade-secret misappropriation, breach of contract, unfair competition, and civil theft under the Texas Theft Liability Act. The case was tried to a jury, which found in favor of Wellbeing on all of its theories and awarded corresponding damages under each. After Wellbeing made an election of remedies, the trial court

---

[1] After Harper and PLLG filed their motion for rehearing contending that this Court erred in permitting Wellbeing to elect from its tort claims on remand, we requested that the parties submit supplemental briefing on the issues of the evidence supporting the jury's verdict under PLLG's alternative theories, the one-satisfaction rule, and the proper amount of damages to be awarded against PLLG, if any, under an alternative theory. In its supplemental briefing, Wellbeing has waived its claim to a new election of remedies on remand. Accordingly, we reverse the trial court's judgment against PLLG on Wellbeing's breach-of-contract claim and render judgment that Wellbeing take nothing on that claim rather than remand this cause for Wellbeing to elect a new remedy against PLLG.

[2] Urman was an initial appellant but has since dismissed his appeal due to a settlement with Wellbeing. Qivana has not appealed the judgment.

2

rendered judgment awarding Wellbeing $356,712 in damages (plus pre-judgment interest) against PLLG and Urman for breach of their respective confidentiality agreements with Wellbeing; $900,000 in damages (plus pre-judgment interest) against Harper for misappropriation of trade secrets; $22,500 in damages (plus pre-judgment interest) against Qivana for misappropriation of trade secrets; and over $380,000 in attorney's fees against PLLG, Harper, and Urman.

Evidence at trial showed that the parties' relationship began in August 2010, when Harper contacted Stefan Mazy, the manager and owner of Wellbeing, an Australian company. At the time, Harper was looking for a DNA test to distinguish the skin-care products she developed and sold (under the name SkinShift™) in her Austin, Texas, skin-care clinic and customize her product recommendations based on an individual patient's specific DNA. Harper had been contacting various domestic laboratories to see if any of them had or could develop such a test for her, and several of the laboratories recommended that she contact Wellbeing. Shortly after Harper contacted Mazy, she emailed him: "We are excited to be partnering with you and feel the ability to quickly access what you all have spent considerable time and money on is a real asset in us getting to market quickly."

Mazy testified at trial that his experience working at a skin-care clinic in Sydney, Australia, prompted him to begin developing a DNA test based on variations in individuals' DNA that his research had indicated were associated with particular skin-health categories (e.g., firmness and elasticity, wrinkling, and sun damage and pigmentation). Mazy testified that he spent three years of his personal time and money researching and developing his DNA test, which he ultimately trademarked as the SkinDNA™ Genetic Test. He sold the test to spas, estheticians, healthcare

3

providers, and individual consumers and partnered with other businesses to market and distribute the test, often rebranding it to accommodate Wellbeing's so-called "white label" partners. One such white-label partner was VITAGenes, which posted on its website samples of the patient reports that Wellbeing prepared after its lab analyzed a patient's DNA.

Mazy testified extensively about his process developing the SkinDNA™ test and explained the genetics terms and science behind it (as did Wellbeing's expert witness on genetics, Dr. Michael Lee Metzger, PhD). Dr. Metzger explained that a gene is a part of the DNA molecule that is related to a specific trait or that encodes a particular function. Mazy testified that he first considered about 6,000 genes and then closely analyzed about 200 of them before choosing 12 genes for his test. He explained that his research focused on variations within genes that have been found to occur in 1% or more of the population; such variations are known as single nucleotide polymorphisms (SNPs). Millions of SNPs have been identified by the scientific community, each assigned a unique reference number (an "rs number") that essentially serves as its genetic "address." Metzker explained: "If you have the rs number, you can type it into the database and it pulls out the SNP" as well as the population data associated with that SNP. Mazy testified that he analyzed hundreds of SNPs before selecting 15 for his test and showed the jury spreadsheets that reflected his detailed analysis of genes and SNPs. He testified that the SNPs he chose for his test are found in 20-30% of the global population, which was important because he wanted a test that all ethnicities could find useful. He also showed the jury a stack of articles that he read (which reflected only about 20% of all the articles that he read) to evaluate whether the presence of particular SNPs was associated with particular skin categories affecting skin health and aging. He additionally showed the jury his

4

clinical outcomes, validation study, and extensive research notes. The DNA test that Mazy ultimately developed identified a panel of 15 specific SNPs (each identified by its unique rs number) and grouped them into five particular skin-health categories.[3] This particular DNA panel of SNPs and category grouping was asserted by Wellbeing at trial as its alleged "Trade Secret No. 1."[4]

Shortly after her first conversation with Mazy, Harper—as "President" of R.A. Harper, L.P.—entered into a "Stockist Agreement" with Wellbeing, which authorized Harper to exclusively market the SkinDNA™ test in Texas and rebrand it under the SkinShift™ label. Wellbeing agreed to provide the test kits, process the tests, and provide Harper the test results. About a year and a half later, and in connection with Harper's desire to expand her territory to all of the Unites States, she—as "President/Manager" of PLLG—and Wellbeing entered into an "Exclusive Distributor Agreement." Pursuant to that agreement, Wellbeing authorized PLLG to sell Wellbeing's SkinDNA™ test throughout the United States. PLLG agreed to arrange wide publicity for Wellbeing's SkinDNA™ test in the United States, and both parties agreed to "treat as confidential" and safeguard all "information, reports and records pertaining to their relationship that are marked as confidential or proprietary or that are, under the circumstances, reasonable to assume should be confidentially treated." The parties further agreed not to use such information for any purpose other than to perform their obligations under the agreement.

---

[3] One SNP was used twice, once in each of two categories.

[4] The jury charge defined "Alleged Trade Secret No. 1" as: "Specific grouping of sequence variants (also called 'SNPs') into one or more skin-related categories." The jury answered "yes" to question number 7 in the charge, asking whether "Alleged Trade Secret No. 1" constituted a trade secret of Wellbeing, and answered "no" to another claimed trade secret, Alleged Trade Secret No. 2, which was defined as "Genotype scoring into risk categories for product recommendations."

5

To facilitate nationwide distribution of her skin-care products, Harper began discussions with potential distributors, including Qivana, a multi-level marketing company. Harper engaged David Urman[5] to assist with this effort. Because some of the potential distributors had questions about the science supporting the DNA test, Harper and Urman requested that Wellbeing provide them with "scientific back-up." Urman wrote to Mazy in November 2012: "An overinclusive brain dump would get me in a position to collaborate with you more effectively. Nothing goes to third parties without your consent." Urman further assured Mazy that Wellbeing's intellectual property was not at risk in this endeavor: "[W]e are 100% focused on showing the efficacy of the DNA test and that is where the Ferndale [a potential distributor] deal currently hinges. We have stringent NDAs [non-disclosure agreements] in place to protect our mutual IP [intellectual property]."

Wellbeing provided Harper and Urman their requested scientific back-up, including so-called "data cards" for the genes used in the SkinDNA™ test and supporting scientific articles. Mazy authorized Harper and Urman to disclose three data cards to potential distributors and others with which they sought to do business using the test, and Mazy assisted Harper with an interview she gave to a reporter from the *L.A. Times* in an effort to publicize their business. Upon Harper's request for further scientific back-up, Mazy provided her the additional 12 data cards he had prepared for the SkinDNA™ test. Mazy testified that these 12 data cards, combined with the first three that he provided (for a total of 15) contained his intellectual property in the form of his trade secret. Mazy further testified that he did not provide all 15 of the data cards to any party outside of Wellbeing except Harper and the lab that performed the tests.

---

[5] Urman signed a separate non-disclosure agreement with Wellbeing, which the jury found he breached.

In March 2013, Harper filed a provisional application for a U.S. patent on "Methods of Skin Analysis and Uses Thereof." To assist in the preparation of the application, Urman sent to Harper's patent counsel various Wellbeing documents, including the data cards for three genes, one of which was copied nearly verbatim into the application. Later that year, Urman contacted Justin Banner, a founder and officer of Qivana, about the possibility of Qivana distributing Harper's skin-care products personalized with a DNA test. Urman sent to Banner a copy of the provisional patent application, a "white paper" originating from Wellbeing explaining SkinShift™'s use of Wellbeing's DNA test (without attributing it to Wellbeing) to personalize patients' skin-care-product selections, and one of Wellbeing's data cards (slightly edited).

Around the same time, Harper hired Dr. Linda DiBella, PhD, to help her create a DNA test for a U.S. lab to run for her skin-care line. Since 2012, PLLG had been searching for a U.S. lab to run its DNA tests and had attempted to find other labs, including one identified in the record as Genemarkers, to develop a DNA test of PLLG's own. The evidence showed that in January 2013, Urman sent an email to Harper attaching information to be provided to Genemarkers' president in advance of a conference call about the development of a test; the information included several of Wellbeing's data cards. The evidence showed that PLLG did not end up working with Genemarkers on the development of a test. Rather, DiBella and Harper pursued development of a DNA test for PLLG's use on their own. DiBella testified that she spent about 100 hours over the course of six months to develop a DNA test "from scratch," pursuant to Harper's mandate. Harper testified that she collaborated with DiBella in the test development and was responsible for making the "final decision" regarding the 32 SNPs that PLLG selected for its DNA test. An email sent from

7

Harper to DiBella during this time frame demonstrates that DiBella had access to all 15 of Wellbeing's data cards while developing PLLG's test.

Contemporaneously, Qivana and PLLG were negotiating the details of an agreement to distribute PLLG's SkinShift™ products, combined with a DNA test, and both parties were also in communication with another U.S. lab, Sorensen, to engage it in the processing of PLLG's test. Qivana and PLLG signed a "Memorandum of Understanding" in March 2014 outlining their mutual intent to enter into an exclusive distributor agreement whereby Qivana would market and distribute the SkinShift™ products, and PLLG would lend Harper's name and brand to Qivana for such purpose. The parties executed an "Exclusive Distribution Agreement" in September 2014, in which Qivana agreed to pay PLLG initial payments totaling $450,000 as well as royalties equal to 8% of gross product sales, with a right to minimum royalties of $400,000 the first year and $600,000 each year thereafter (for the five-year contract term). During this time period, Urman sent Banner an email containing a "confidential" list of rs numbers—including eight of the 15 used on Wellbeing's test—to share with Sorensen. DiBella testified that PLLG's 32-SNP test was completed in July 2014; within ten days, Qivana and Sorensen entered into a contract whereby Sorensen agreed to process DNA tests for Qivana using PLLG's 32-SNP panel after first performing "assay development" and validation of the test. Wellbeing filed this lawsuit shortly thereafter.

**DISCUSSION**

Harper and PLLG challenge the sufficiency of the evidence supporting the jury's findings that (1) Trade Secret No. 1 was secret and (2) appellants misappropriated the secret, which directly and proximately caused Wellbeing damages. They also contend that Wellbeing's expert

8

testimony on damages amounted to no evidence because it was based on "sheer speculation," and was, therefore, insufficient to support the expert's "reasonable royalty" calculation of damages. *See Southwestern Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) (listing factors that factfinder may consider in determining "reasonable royalty" damages for trade-secret misappropriation). Finally, appellants assert that the trial court erred in awarding Wellbeing lost-profit damages against PLLG for breach of contract because the contract expressly precludes indirect and consequential damages.[6]

When conducting a legal-sufficiency review, we must view the evidence in the light most favorable to the jury's findings, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). Moreover, we must indulge every reasonable inference that would support the jury's findings. *Id.* at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827. When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we should set aside the finding only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We must not merely substitute our judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We review a trial court's interpretation of an unambiguous contract de novo, *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445,

---

[6] Alternatively, appellants argue that Wellbeing's contract claim against PLLG is preempted by federal copyright law.

449 (Tex. 2015), as we do a trial court's determination of whether damages awarded in a case constitute direct or consequential damages, *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 117 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

***Was Trade Secret No. 1 actually secret?***

In their third issue, appellants contend that "there is legally and factually insufficient proof that Wellbeing's 'Alleged Trade Secret No. 1' was in fact secret." The jury charge defined a trade secret as:

> a process, formula, pattern, device, or compilation of information which is used in one's business and which gives the business an actual or potential economic advantage over competitors who do not know or use it.
> Information that is publicly available, or becomes publicly available by means other than breach of a contractual duty of confidentiality, cannot be a trade secret. Likewise, information that is generally known in the industry, or that is independently developed, or that is readily ascertainable by independent investigation or by reverse engineering, cannot be a trade secret. "Reverse engineering" means the process of studying, analyzing, or disassembling a product or device to discover its design, structure, construction, or source code provided that the product or device was acquired lawfully or from a person having the legal right to convey it.

The charge further provided factors that the jury was permitted to consider in determining whether Alleged Trade Secret No. 1 was a trade secret: (1) the extent to which the information is known outside Wellbeing's business; (2) the extent to which the information is known by Wellbeing's employees and others involved in its business; (3) the extent of the measures taken by Wellbeing to guard the secrecy of the information; (4) the value of the information to Wellbeing and its competitors; (5) the amount of effort or money expended by Wellbeing in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

10

To support their argument on this issue, appellants rely on the testimony of their expert witness on genetics, Dr. Carlos Bustamante, PhD, who testified about his attempts during the discovery process to duplicate Wellbeing's DNA panel using publicly available materials on the internet and two previously published patent applications. Bustamante testified that the two patents, identified in the record as the "Giampapa" and "DeFilippo" patents, plus a third source—a peer-reviewed scientific article identified in the record as the "Sulem paper"—together revealed all 15 of the SNPs and genes that Wellbeing included in its DNA panel. Bustamante summed up his opinion about "how secret" Wellbeing's panel was: "Not very secret at all. You could reconstruct it with two patents and a paper."

Using a slideshow exhibit, Bustamante further demonstrated for the jury how he had conducted internet searches (using the Google search engine and the website SNPedia) using terms revealed in sample patient reports published on Wellbeing's own website (as well as that of one of its white-label partners, VITAGenes). According to Bustamante's testimony, using only certain terms—relating to genes, chromosomes, skin categories, and skin characteristics—appearing on the publicly available patient reports, he was able to identify all but one of the SNPs on Wellbeing's panel, and the remaining SNP he was able to narrow down to one of two possible SNPs. In conclusion, Bustamante opined that it would be "easy peasy" for someone to replicate Wellbeing's SNP panel using only publicly available information from Wellbeing's and VITAGenes's websites. Bustamante admitted on cross-examination that he knew which SNPs were on Wellbeing's DNA panel before he began to duplicate the panel from publicly available information and that the Giampapa patent contained several genes and numerous SNPs in addition to those 15 selected by

11

Mazy for his DNA panel. As with any testimony, the jury was free to disbelieve or disregard any or all of Bustamante's testimony. *See Bay Rock Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 298 S.W.3d 216, 229–30 (Tex. App.—San Antonio 2009, pet. denied).

In support of the jury's finding on this issue and of the factors listed in the jury charge, Wellbeing cites the testimony of Mazy and Metzger. As summarized in the background section above, Mazy testified extensively about his three-year process developing Wellbeing's DNA panel. He testified that he considered "Alleged Trade Secret No. 1" to be a trade secret, and that he did not disclose the complete secret to any outside party except the lab that conducted his DNA tests and Harper, pursuant to her request for all 15 of the data cards, from which she could have determined his chosen rs numbers and skin-category groupings. Mazy testified that he ensured that confidentiality agreements were in place before disclosing Wellbeing's confidential information to third parties, and that he only provided the same three data cards, each of which disclosed only one SNP, to each of Wellbeing's distributors around the world, with the exception of providing all 15 of the data cards to Harper.

Mazy explained that the reports Wellbeing and its white-label partners provided to patients did not reveal Wellbeing's confidential information. For instance, they did not reveal which specific genes were tested, partly to prevent the "competition" from knowing Wellbeing's SNP panel, and partly to make them easier to understand by the patient. In response to an emailed query from Harper in September 2012 asking how—in light of the information (i.e., gene location) provided on the patient reports—Wellbeing nonetheless protected its intellectual property (IP), Mazy replied: "Basically the gene location on the report is a small piece of the puzzle—that location

12

can contain up to 10 other genes—within each gene there would be anywhere between 500 and 1000 SNPs[.]  its [sic] knowing the right SNP to test is where the IP lies.  The IP also lies in the combination of SNP's and the links we have associated with the ageing traits—something no other lab can associate that link."  His email continued: "To this day no one has been able to imitate the test, we're even talking about the big firms such as P&G [Proctor & Gamble] who have been trying to find the exact SNP's—the results, though detailed do not provide the things the competitors need."  Mazy explained to the jury that he could have pursued a patent for Wellbeing's SkinDNA™ test but that such publication would have disclosed his IP; rather, he chose to rely on the common-law protections afforded to trade secrets to protect his IP.

In response to a potential new distributor's concern about protection of the IP at issue, Urman replied in an August 2012 email: "SKINSHIFT [sic] is the first company to identify 16 SNPs that are relevant to skin health categories.  Additional SNPs are being discovered as we speak.  The location of all of these SNPs will not be disclosed and will be treated as a trade secret."  He further wrote that the development of the DNA test used by SkinShift™ had "taken over four years," been researched and developed to "maximize predictive value," and given SkinShift™ a "multiple year head start."

Metzger, Wellbeing's genetics expert, testified that he reviewed more than 40,000 documents produced in this lawsuit, as well as the deposition transcripts.  He opined that it would have taken a "reasonable investigator"—someone with a graduate degree in a relevant field, such as genetics or molecular biology, or with a couple years' experience in a lab or the cosmeceutical field—about 33 months, plus "a little bit of luck," to develop a test "from scratch" equivalent to Wellbeing's without using Wellbeing's confidential information.  He outlined the various phases of

13

such development, from the initial background research phase, to the honing down and selection of SNPs from among the millions available in the public database, to the reading of relevant scholarly articles, to the laboratory testing, to the designing of reagents to be used in the test, and finally to the validation studies confirming that the test is reliable.

A jury may believe one witness and disbelieve others, may resolve inconsistencies in the testimony of any witness, and may accept lay testimony over that of experts. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). While Bustamante's testimony constituted some evidence tending to disprove the actual "secrecy" of Alleged Trade Secret No. 1, there was ample contrary evidence in support of the jury's finding, as summarized above, that Trade Secret No. 1 was a secret, and our review of the record leads us to conclude that the evidence supporting the finding is not so weak as to be clearly wrong and manifestly unjust, *see Cain*, 709 S.W.2d at 176, and that reasonable and fair-minded people could have made the finding that the jury made, *see City of Keller*, 168 S.W.3d at 807. Accordingly, we overrule appellants' third issue.

**Did Harper and PLLG misappropriate Trade Secret No. 1?**

In their first and second issues, appellants challenge the sufficiency of the evidence supporting the jury's finding that appellants misappropriated Trade Secret No. 1. On this question, the jury charge read:

> In order to find that [defendants] misappropriated a trade secret, you must find that:
>
> 1. Defendant(s) used or disclosed the trade secret in breach of a duty of confidentiality without Wellbeing'[s] authorization; and

2. The use of the trade secret was the direct and proximate cause of damage to Wellbeing[.]

> For a person to have misappropriated a trade secret, the person must have known or had reason to know that the information was a trade secret. "Use" means a commercial use by which a person seeks to profit from the trade secret. Merely receiving trade secret information does not constitute "use" of a trade secret. Misappropriation does not require that the person use the trade secret in exactly the form in which the person received it; however, it must be substantially derived therefrom. There is no misappropriation when the contribution of the trade secret is slight and the person's process can be said to have been derived from other sources.

Appellants assert that the misappropriation verdict cannot stand because the evidence is insufficient to show that (1) Wellbeing provided[7] the secret to them and (2) they disclosed the secret to unauthorized parties. Appellants' argument focuses on whether the evidence shows that they "disclosed" the trade secret rather than whether they "used" it "in breach of a duty of confidentiality," as outlined in the jury charge. Based on the jury charge, and as correctly stated in Wellbeing's brief and applicable caselaw, *see, e.g.*, *Southwestern Energy*, 491 S.W.3d at 722 (stating that "use" of trade secret means "commercial use by which the offending party seeks to profit from the use of the trade secret"), sufficient evidence of *either* disclosure *or* unauthorized use will support the jury's misappropriation finding, and our review of the record leads us to conclude that there is legally and factually sufficient evidence to support the finding.

---

[7] The jury charge did not require the jury to find that Wellbeing "provided" the secret to appellants, nor do we conclude that such requirement was implied in the charge. Nonetheless, we conclude that the record contains sufficient evidence to support an implied finding, if necessary, that Wellbeing "provided" appellants its trade secret, as will be outlined in this section summarizing the evidence supporting the jury's misappropriation finding, especially in the form of Metzger's testimony.

15

As summarized above, Wellbeing provided all 15 of its data cards to Harper. While the data cards did not visually display the information the same way that the slide presented to the jury depicting "Trade Secret No. 1" did, Metzger testified that the data cards contained all of the information comprising claimed Trade Secret No. 1 and that it would be "straightforward" for a person to glean Wellbeing's chosen rs numbers (SNPs) and their respective skin-health categories from the information disclosed in the data cards. Mazy similarly testified that an educated, "investigative type" of person could easily figure out Wellbeing's SNPs based on the information in the confidential data cards, using the combination of the gene names, chromosome locations, and reference articles cited. He testified that the relatively few reference articles cited in the data cards are very specific, each listing a few SNPs, that some of the SNPs he chose were listed in the title of the articles, and that the articles identifying his chosen SNPs also identify the gene. Metzger opined that appellants misappropriated Trade Secret No. 1 by publishing the provisional patent application and using the secret to get a "head start" on development of their own DNA panel. Appellants did not object to Metzger's expert qualifications or testimony.

Wellbeing further presented evidence showing that Harper used Trade Secret No. 1 to prepare her patent applications. For instance, Urman—on behalf of Harper—sent the data cards to her patent-prosecution counsel, and one of the cards was inserted nearly verbatim into her provisional patent application. The patent application disclosed 11 of the 12 genes in Trade Secret No. 1 and 12 of the 15 SNPs in the trade secret, grouped into the same skin-health categories used by Wellbeing. Metzger testified that Harper's provisional patent application contained the majority of Trade Secret No. 1, enough to disclose and destroy it.

16

Wellbeing also presented evidence showing that PLLG used Trade Secret No. 1 to develop an SNP panel for its own DNA test. PLLG hired DiBella, to whom Harper sent Wellbeing's data cards, to help develop the test. DiBella had no prior experience developing a DNA test, and spent only about 100 hours on developing it (compared to Mazy's three years). Metzger opined that neither Harper nor DiBella had the capability to develop such a DNA test, and that it would take a reasonable investigator 33 months to develop one. Harper, PLLG, and DiBella did not produce detailed work papers as Mazy did. Metzger testified that the SNP panel that PLLG sent to Qivana to give to Sorensen included seven of the 15 SNPs in Trade Secret No. 1. He explained that the original SNP list provided to Sorensen contained several more of Wellbeing's SNPs but that they were ultimately removed from PLLG's final DNA panel only because Sorensen could not find easily available reagents to test for those SNPs.

Based on this summary as well as other evidence in the record, we conclude that the evidence supporting the jury's misappropriation findings—including the finding that appellants "used or disclosed" Wellbeing's trade secret—is not so weak as to be clearly wrong and manifestly unjust, *see Cain*, 709 S.W.2d at 176, and that reasonable and fair-minded people could have made the findings that the jury made, *see City of Keller*, 168 S.W.3d at 807. We overrule appellants' first and second issues.

### *Is there sufficient evidence supporting the jury's award of damages?*

In their fifth issue, appellants contend that the reasonable-royalty calculation of damages testified to by Wellbeing's damages expert, Christopher Bakewell, was based on "sheer speculation," *see Southwestern Energy*, 491 S.W.3d at 712 ("Damage estimates . . . cannot be based

17

on sheer speculation.") and, therefore, amounts to "no evidence" of damages, *see Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (noting that no-evidence point will be sustained when evidence offered to prove vital fact amounts to no more than mere scintilla). Specifically, they take issue with Bakewell's reliance on a particular "Marketing Plan Outline" that was, they claim, merely a "pie in the sky" projection of revenue generated to entice Harper to enter into an exclusive distributorship agreement with Qivana, rather than a realistic projection of sales.

At trial, appellants did not object to Bakewell's qualifications as an expert or to his expert testimony. "An expert opinion admitted into evidence without objection 'may be considered probative evidence even if the basis for the opinion is unreliable.'" *Id.* at 717 (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009)). Absent an objection, an expert's opinion may nonetheless be deemed unreliable and will not be considered probative evidence if it lacks a factual basis. *Id.* Accordingly, we consider whether the record contains any factual bases for Bakewell's opinion or whether—as appellants contend—his opinion was based on *no* factual bases but, rather, mere speculation. *See id.* at 712, 717.

Initially, we note that the marketing outline about which appellants complain was not the sole piece of information that Bakewell considered in making his calculations. He testified that he also considered evidence of the prior experience of Qivana's management (who had "taken" their previous company, Xango, to "$1 billion in sales"), the Memorandum of Understanding signed by PLLG and Qivana (which recited, "based on prior experience, international expansion and adoption curves, Qivana anticipates royalty payment to Dr. Ruthie Harper to exceed $7,500,000" in the five years following the launch), Urman's deposition testimony (in which he testified that he

18

considered the Qivana projections to be reasonable based on his investigation and consultation with third parties), and the minimum payments that Qivana committed to make to preserve its exclusivity in the exclusive distributor agreement between PLLG and Qivana. Bakewell testified that he considered other factors that might have caused Qivana to make less revenue in reality than what was projected—including adverse patient reactions potentially due to Harper's changes to her test or to the fragrance added to her skin-care products. Bakewell testified that—in light of such post-misappropriation events—measuring the value of the trade secret by considering Qivana's actual revenue was not appropriate, explaining his opinion by using a "taco truck" analogy.[8] Finally, Bakewell testified that he had considered PLLG's negotiations with an earlier potential, unrelated distributor—identified in the records as Neways—in making his reasonable-royalty calculation. Bakewell cited an email from Urman to Harper in which Neways had projected similar types of revenues to those later projected by Qivana in the marketing outline. Bakewell summed up: "[A]ll this information fits together. It triangulates . . . and is consistent with [a reasonable projection] of 7 million dollars in royalties over five years."

Moreover, whether the Marketing Plan Outline referenced by Bakewell and challenged by appellants is "speculative" and amounts, therefore, to "no evidence" is merely appellants' characterization of that document; such characterization does not render the document so. The Marketing Plan Outline was admitted into evidence and, indeed, constitutes a "factual basis"—one

---

[8] He analogized valuing Trade Secret No. 1 to valuing a popular and successful taco truck that, if it were stolen and then crashed, resulting in damage to the truck and loss of the business's recipes, the business would have far less value—due to these post-misappropriation events—than before the truck was stolen, through no fault of the taco truck's owners.

19

among others—upon which Bakewell relied in arriving at his expert opinion. Whether the document's projections represented wishful thinking or reasonable profit projections (i.e., whether it was credible) was a question within the jury's province.[9] An answer to that question unfavorable to Wellbeing does not render Bakewell's opinion unreliable; the fact remains that the document was one of the factual bases on which he relied, and it constitutes more than a scintilla.

In addition to Bakewell's testimony, the record contains evidence concerning various of the factors that courts have held may be considered in a reasonable-royalty calculation for trade-secret misappropriation. *See Southwestern Energy*, 491 S.W.3d at 712–13 (listing factors). The jury was charged with determining a reasonable royalty, defined as "the amount of money a reasonably prudent investor would have paid for the trade secret at the time of misappropriation as a fair price for licensing to put the trade secret to the use intended." The jury was instructed that it could consider the following factors:

(1) The resulting and foreseeable changes in the parties' competitive positions;
(2) Prices paid by licensees in the past;
(3) The total value of the trade secrets to Wellbeing [], including to Wellbeing[']s development costs and the importance of the secret to Wellbeing[']s business;
(4) The nature and extent of the use of PLLG, Harper and/or Urman's intended [use] for the trade secrets; and
(5) Other factors, such as whether an alternative process exists.

---

[9] There is evidence in the record demonstrating that other players in the transaction at issue considered the numbers in the projection reasonable. For example, Urman testified in his deposition that he considered the marketing projections to be realistic, even communicating to a friend of his that the Qivana deal was worth $7 million to SkinShift™ (its portion of a total of $84 million in sales) over the next five years. Similarly, Banner—who had been a part of the management team that had been so successful with Xango—sent a copy of the projection to all three of the other principals of Qivana, which he presumably would not have done were the projection unreasonable.

20

Evidence of all the factors is not required. *Id.*

Regarding changes in the parties' competitive positions (the first factor), the evidence showed that although PLLG agreed to keep Wellbeing's proprietary information confidential and use it only to meet its obligations under the agreement, it nonetheless used Trade Secret No. 1 to prepare a patent application, pursue an exclusive distributorship agreement with Qivana, and develop its own test to be run by a third-party lab (Sorensen), rendering Wellbeing's test unnecessary.

While there was no direct evidence of the second factor (prices paid by past purchasers or licensees), Bakewell testified about the independent negotiations that PLLG had conducted with Neways and that company's revenue projection that was similar to that of Qivana. Furthermore, the jury could have viewed the executed distributorship agreement between Qivana and PLLG as some evidence of how much Qivana (presumably a "reasonably prudent investor") was willing to pay to license the DNA test as part of its right to distribute the unique, customized-by-DNA-test skin-care line. With respect to the third factor, Mazy testified extensively about his three years' development of the SkinDNA™ test, including investing in building a lab to process the tests. Because Wellbeing provided no other service than the SkinDNA™ test, the test essentially constituted the entirety of Wellbeing's value, and destruction of its trade secret would have amounted to the near-total loss of the value. Evidence pertaining to the fourth factor—the use or intended use by PLLG of the trade secret—has already been addressed supra, including PLLG's use of the secret to prepare a patent application, obtain a distribution agreement with Qivana, and quickly develop a "new" test.

21

Finally, we note that the jury did not award damages in the full amount testified to by Bakewell. Besides that amount, the jury heard the damages testimony of PLLG's expert, Thomas Glass, who calculated a reasonable royalty of between $143,000 and $373,000, depending on when the jury concluded that the misappropriation occurred. Additionally, the executed Qivana–PLLG exclusive distributorship agreement was admitted into evidence, in which Qivana agreed to pay PLLG a total of $450,000 for its exclusive right to distribute the SkinShift™ products as well as minimum royalties of $400,000 the first year and $600,000 for each of the next four years. The jury generally has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). Based on our review of the entire record, we conclude that the evidence was legally and factually sufficient to support the jury's damage award, and we overrule appellants' fifth issue.

***Is the award of lost profits precluded by the contract's disclaimer of consequential damages?***

In its sixth issue, PLLG contends that the contract-damages award against it was precluded by the parties' agreement. The jury found that PLLG "fail[ed] to comply with the Exclusive Distributor Agreement between PLLG and Wellbeing" and awarded Wellbeing total past and future damages of $356,712 for such breach. The trial court rendered its final judgment in accordance with this verdict (and Wellbeing's election of remedies against PLLG). PLLG contends that this award was based on Wellbeing's expert's testimony calculating benefit-of-the-bargain damages as the profits that Wellbeing "lost" due to PLLG's breach and being "cut out of the picture" in the Qivana

22

deal, and that it categorically constitutes indirect or consequential damages, which are expressly precluded by the agreement.

The parties' agreement stated, in relevant part:

> LIMITATION OF LIABILITY. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING (WITHOUT LIMITATION) LOSS OF PROFIT, INCOME OR SAVINGS, EVEN IF ADVISED OF THE POSSIBILITY THEREOF.

By its plain language, the agreement limits both parties' liability by precluding "indirect" and "consequential" damages. Because the agreement does not define the terms "indirect" and "consequential" damages, we presume that the parties intended their ordinary meanings. *See DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 179 (Tex. App.—Fort Worth 2012, no pet.). Direct damages are defined as "the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). They compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act. *Id.* Consequential (or indirect) damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *See id.*; *Manuel*, 362 S.W.3d at 180 (noting that consequential damages require existence of some other fact beyond relationship of parties and are, thus, "contingent"). Consequential damages need not be the usual result of the wrong, but they must be foreseeable. *Arthur Andersen*, 945 S.W.2d at 816.

While appellants argue that the agreement also precludes "lost profits" damages, we conclude that the cited provision does not create a blanket prohibition of damages measured

23

by the loss of profits *unless* those lost profits are indirect, incidental, special, or consequential. The phrase "loss of profit" in the cited provision comes after the word "including," which means that the agreement excludes only indirect, special, or consequential lost-profit claims, not direct lost-profit claims. *See Tennessee Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at *7, 11 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. denied) (mem. op.) (interpreting contract with similar clause as precluding only consequential lost profits but not direct lost profits and upholding trial court's determination that particular lost profits at issue were consequential and, thus, properly excluded). We must, therefore, determine whether the lost profits at issue constitute direct or consequential damages. *See id.*; *see also Manuel*, 362 S.W.3d at 181 (noting that lost profits may be either direct or consequential damages, depending on their nature); *Continental Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 475 (Tex. App.—Eastland 2003, no pet.) (same).

Profits lost on the breached contract itself, such as the amount that a party would have received on the contract but for the breach (i.e., lost profits that represent the benefit-of-the-bargain measure of damages required to restore the plaintiff to the economic position he would have enjoyed if the contract had been performed) are classified as "direct" damages; profits lost on other contracts or relationships resulting from the breach (such as resale of property to a third party) are classified as indirect or consequential damages. *Manuel*, 362 S.W.3d at 181; *see Tennessee Gas Pipeline*, 2008 WL 3876141, at *11.

Bakewell testified that he calculated Wellbeing's breach-of-contract damages by determining the number of DNA test kits that Qivana and PLLG projected would be sold under the parties' exclusive distributorship agreement. He then multiplied that number by the profit that

Wellbeing would have received on each DNA test kit based on those projected sales. Using such a calculation, he testified that the total amount Wellbeing "lost" due to PLLG's breach and being cut out of the Qivana deal was $4.1 million. In contrast, Glass used the actual profits (rather than projected profits) that Qivana and PLLG made on sales of DNA kits to calculate the amount of damages that Wellbeing suffered from PLLG's breach. Glass's total "lost profits" calculation amounted to $85,985. The jury awarded an amount between the two experts' calculations.

To determine whether the lost profits awarded were direct or consequential damages, we must consider how they relate to the nature of the breaches that were alleged and proved at trial—i.e., did the damages flow "necessarily" from the breach, or only "naturally"? *See Arthur Andersen*, 945 S.W.2d at 816. The evidence supported findings that PLLG breached the confidentiality provisions of the agreement by (1) disclosing Wellbeing's confidential information to third parties (e.g., Qivana and Sorensen) and the public, without authorization; and (2) using Wellbeing's confidential information for purposes other than to perform its obligations under the agreement (e.g., as a "starting point" to develop its own DNA test). While the profits that Wellbeing "lost" *naturally* flowed from PLLG's unauthorized disclosure and use of its confidential information to develop its own DNA test, they are not the type of damages that would *necessarily* flow from such breaches. For example, had PLLG unlawfully developed its own DNA test using Wellbeing's confidential information but chosen to nonetheless continue to use Wellbeing's test (or chosen to legally use the DNA test of a third party), Wellbeing would not have suffered its claimed lost profits, even with consummation of the Qivana deal. Similarly, Wellbeing would not have suffered its claimed lost profits if, despite PLLG's breach, PLLG was for some reason unable to close the Qivana

25

deal. Because the lost profits at issue were caused by a relationship *resulting* from the breach and were *incidental to* the breach, rather than caused by the breach itself, they are categorically indirect and consequential rather than direct. *See Tennessee Gas Pipeline*, 2008 WL 3876141, at *11 ("If a party's expectation of profit is incidental to the performance of the contract, the loss of that expectancy is consequential."). Accordingly, the breach-of-contract damages asserted and proven here are expressly precluded by the parties' agreement, and the trial court erred in awarding them. We sustain appellants' sixth issue and reverse the award of damages against PLLG.[10] Additionally, because we hold that Wellbeing is not entitled to damages for PLLG's breach of contract, we must also reverse the award of attorney's fees to Wellbeing on that claim. *See Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 242 S.W.3d 67, 75–76 (Tex. App.—San Antonio 2007, pet. denied); *see also Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004) (per curiam) (holding that to recover attorney's fees in breach-of-contract action, claimant must recover actual damages).

## CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment awarding Wellbeing damages and attorney's fees on its breach-of-contract claim against PLLG and render judgment that Wellbeing take nothing on that claim. We affirm the judgment of the trial court in all other respects.

---

[10] Because of our disposition on this issue, we need not reach appellants' alternative argument, asserted in the same issue, regarding preemption. Likewise, we need not address appellants' fourth issue, in which they contend that there is no "causal link" between the jury's award of "lost profits" damages and the misappropriation, or reach the portion of their fifth issue challenging the sufficiency of the evidence supporting the breach-of-contract damages.

_____

David Puryear, Justice

Before Justices Puryear, Field, and Bourland

Affirmed in Part; Reversed and Rendered in Part on Motion for Rehearing

Filed: December 4, 2018

27